**In re The DUPLAN CORPORATION, Duplan Fabrics, Inc., Debtors.**

**Bankruptcy Nos. 76–B–1967 CB, 76–B–1968.**

United States Bankruptcy Court, S.D. New York.

June 11, 1997.

Stroock & Stroock & Lavan, New York City by Brian M. Cogan and Kristopher M. Hansen, for Goldman Sachs and Company.

Tofel, Berelson, Saxl & Partners, P.C., New York City by Lawrence E. Tofel and Mark Lopeman, for Paul Lazare, Andreas Gal and Panex Trust.

McCarter & English, Newark, NJ by Gita F. Rothschild, for First Manhattan, Firmanco & Dan Rosenbloom.

Weil, Gotshal & Manges, L.L.P., New York City by Martin J. Bienenstock, for Texaco, Inc.

Archer & Greiner, P.C., Haddonfield, NJ by Robert T. Lehman and Arthur H. Jones, Harriton & Mignano, L.L.P., Tarrytown, NY by Keith S. Harriton, for Esso.

## REVISED MEMORANDUM DECISION ON ENFORCEMENT OF PERMANENT INJUNCTION IN FINAL DECREE

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

Goldman, Sachs & Co. ("Goldman") moves this Court for an order enforcing the final decree entered in the bankruptcy case of The Duplan Corporation and Duplan Fabrics, Inc. by enjoining Texaco, Inc., Texaco Caribbean, Inc., and Vernon Morgan (collectively, "Texaco") and Esso Virgin Islands, Inc. and Esso Standard Oil Co. (P.R.) (collectively, "Esso") (together with Texaco the "Oil Companies") from proceeding with claims asserted against Goldman in an action pending in the United States District Court for the Virgin Islands (the "Virgin Islands Court"). Firmanco Associates, First Manhattan Co., Daniel Rosenbloom, Andreas Gal ("Gal") and Paul Lazare ("Lazare")—on behalf of others similarly situated—join in Goldman's motion for an injunction.

### BACKGROUND

#### A. The Bankruptcy Proceeding

The Duplan Corporation ("Duplan" or the "Debtor") was a publicly traded Delaware corporation engaged in the textile industry, with its principal place of business in New York. On or about August 31, 1976, Duplan and Duplan Fabrics, Inc. (collectively the "Debtors") filed petitions for relief in the Bankruptcy Court in this district under Chapter XI of the Bankruptcy Act of 1898. By order dated October 5, 1976, the case was converted to a case under Chapter X. Thereafter, the case was transferred to the United States District Court for the Southern District of New York (the "District Court"), wherein a reorganization trustee was appointed (the "Trustee") and July 10, 1979 was established as the last day to file proofs of claims against the estates (the "Bar Date").

In 1970, prior to filing its petition, Duplan had acquired Laga Industries, Ltd. ("Laga"), a Virgin Islands corporation that operated a textile manufacturing facility in TuTu, St. Thomas (the "Laga Facility"). Before the acquisition, Laga was owned by Gal and Lazare, who became employees and officers of Duplan after the acquisition. By order dated August 28, 1979, the District Court authorized the Trustee to sell the Laga Facility. On December 12, 1979, the facility was sold to a New York partnership consisting of Gal and Lazare.

By order dated June 4, 1981 (the "Confirmation Order"), the District Court confirmed the Trustee's Amended Plan of Reorganization (the "Plan"). Pursuant to the Plan, Duplan was renamed Panex Industries, Inc. ("Panex" or the "Reorganized Company"). Under the Plan, various creditors of Duplan received cash and new shares in the Reorganized Company in partial satisfaction of their claims against the Debtors. Goldman, Firmanco Associates, and First Manhattan Co. were among the many creditors who received shares in Panex.

On June 27, 1983, the District Court entered a final decree closing the bankruptcy case and approving the Trustee's Final Report (the "Final Decree"). The Final Decree provided for a general discharge of the Debtors' debts and liabilities (the "Discharge") and permanently enjoined all persons having claims against the Debtors from commencing any suit against the Debtors, Panex or any party with an interest in the Debtors (the "Permanent Injunction"). The Final Decree also provided that the court "retain jurisdiction" to enforce its orders and determine any issues related to the case.

Panex emerged from bankruptcy with over 300 shareholders. In September of 1984, the

shareholders voted to dissolve Panex. A certificate of dissolution was filed with the Delaware Secretary of State on April 15, 1985. The assets were distributed among the shareholders and, on September 12, 1985, a liquidating trust in the amount of $6 million was created to cover any contingent claims against Panex (the "Panex Trust"). In 1987, absent any substantial claims, the Panex Trust made a distribution to the shareholders of $4.8 million, leaving approximately $1 million remaining in the trust. Gal, Lazare, Firmanco, and Goldman received $4,304,794 of the $4.8 million distributed. *See* Memorandum of Law of Esso, at 10. The trust continues to exist with Lazare and Rosenbloom serving as its trustees (the "Panex Trustees").

### B. *The Virgin Islands Litigation*

In 1989, owners and lessees of wells in the Tutu aquifer region (the "Tutu Site"), where Duplan had operated the Laga Facility, commenced an action in the United States District Court for the Virgin Islands (the "Virgin Islands Court") alleging various common law claims and claims under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") against the Oil Companies and others for damages resulting from environmental contamination. In 1992, the Oil Companies impleaded Laga, Duplan, Panex, Lazare and Gal (the "Laga Defendants") seeking common law contribution and recovery of response costs under CERCLA. The third-party complaints alleged that the Laga Defendants were responsible for the discharge of Perchloroethylene (PCE) at the Tutu Site from 1970 through 1979. Apparently, contamination at the Tutu Site was discovered in 1987. PCE, a dry-cleaning chemical used by the Laga Facility, was among the many contaminants allegedly found at the site.

The Laga Defendants moved the Virgin Islands Court to dismiss the third-party complaints, alleging that they were without capacity to be sued and that the claims had been discharged in Duplan's bankruptcy proceeding since they were based on pre-petition releases or threatened releases of hazardous substances. The Virgin Islands Court held that under Delaware Corporations law the Laga Defendants were without capacity to be sued for the common law claims. The court, however, held that they could be sued with respect to the CERCLA claims since state capacity statutes were preempted by CERCLA. The court further held that because a cause of action under CERCLA did not come into existence until CERCLA's enactment in 1980 and the Plan, according to the court, was alleged to have been consummated in 1979, when Duplan's Trustee was authorized to sell Laga, the claims under CERCLA were not discharged. Thus, the motion to dismiss the CERCLA claims was denied (the "Virgin Islands Court's Decision").[1]

Thereafter, the Oil Companies sought to enjoin the Panex Trustees and Laga Defendants from winding up the Panex Trust in the Delaware Chancery Court. The Virgin Islands Court temporarily, then permanently, enjoined the Panex Trustees and Laga Defendants from proceeding in the Delaware Court (the "Virgin Islands Court's Injunction"). The Laga Defendants appealed the injunction. On appeal, the Third Circuit reversed the injunction and directed the Virgin Islands Court to dismiss the claims against the Laga Defendants on the grounds that CERCLA did not preempt the state's capacity statute and the Laga Defendants were without capacity to be sued because Panex and Duplan had been dissolved since 1985, and Laga since 1981. Accordingly, the claims against the Laga Defendants were dismissed.[2]

Unable to sue the Laga Defendants, the Oil Companies filed third-party claims for contribution under CERCLA against the Panex Trust, the Panex Trustees, Gal, Firmanco, represented by Daniel Rosenbloom of First Manhattan, and Goldman, as major shareholders of Panex and the distributees of assets of Panex (the "CERCLA Claims"). In

---

1. *See In re Tutu Wells Contamination Litigation,* 846 F.Supp. 1243 (D.Vi.1993).

2. *See In re Tutu Wells Contamination Litigation,* No. 95–7280, 74 F.3d 1228 (3d Cir. December 21, 1995).

the instant motion, Goldman, as a distributee of Panex assets, claims that the CERCLA Claims are barred by the Permanent Injunction in the Final Decree and asks this Court to enforce the Permanent Injunction by enjoining the Oil Companies from pursuing their claims.

### DISCUSSION

Duplan's case was filed under the Bankruptcy Act of 1898 (the "Act"). Although the Act, as amended, was repealed, effective October 1, 1979, and replaced by the Bankruptcy Reform Act of 1978 (the "Bankruptcy Code"), the Act continues to govern cases filed prior to its repeal. *See* §§ 401–403 of Title IV of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598. Thus, the provisions of the Act govern this proceeding.

### I.  *Jurisdiction*

■ As an initial matter, this Court must decide whether it has jurisdiction over Goldman's motion. In the Final Decree, the District Court specifically retained jurisdiction "to enforce its orders and decrees entered herein, to consider and determine any and all issues raised in connection with proceedings pending before this Court, to adjudicate all disputes over exchange and/or distribution of cash or securities under the Plan and to make such orders as may be proper or necessary in carrying out or putting into effect the terms of the Plan or to enforce the order of confirmation." Final Decree ¶ 9. The District Court had authority to retain such jurisdiction under sections 2(15) and 228 of the Act.

Section 2(15), much like § 105 of the Bankruptcy Code, gave district courts sitting in bankruptcy authority to "[m]ake such orders, issue such process, and enter such judgments, in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this Act. . . ." Sec. 2(15), 11 U.S.C. § 11 (repealed 1979).[3] Section 228, governing the entry of final decrees in Chapter X proceedings, required that the court enter a final decree, upon consummation of the plan, discharging the

debtor and trustee and "making such provisions by way of injunction or otherwise as may be equitable." Sec. 228, 11 U.S.C. § 628 (repealed 1979). According to the 14th edition of Collier on Bankruptcy, it was generally desirable that the reorganization court at least reserve jurisdiction in the final decree to make such orders as may be proper or necessary in carrying out or putting into effect the terms of the plan or to enforce the order of confirmation. 6A JAMES WM. MOORE ET AL., COLLIER ON BANKRUPTCY ¶ 11.20 (14th ed.1977) (hereinafter "Collier"). Thus, it is clear that pursuant to sections 2 and 228, the District Court had authority to retain jurisdiction to interpret and enforce the provisions of the Final Decree.

■ Moreover, it is well settled, under both the Act and the Code, that bankruptcy courts have inherent or ancillary jurisdiction to interpret and enforce their own orders, whether or not such jurisdiction is expressly reserved. *Id.; Local Loan Co. v. Hunt,* 292 U.S. 234, 239, 54 S.Ct. 695, 696–97, 78 L.Ed. 1230 (1934); *Evans v. Dearborn Mach. Movers Co.,* 200 F.2d 125, 128 (6th Cir.1952); *Shores v. Hendy Realization Co.,* 133 F.2d 738, 741 (9th Cir.1943); *see also LTV Corp., LTV v. Back (In re Chateaugay Corp.),* 201 B.R. 48, 62 (Bankr.S.D.N.Y.1996); *Texaco Inc. v. Sanders (In re Texaco Inc.),* 182 B.R. 937, 944 (Bankr.S.D.N.Y.1995). While Goldman's motion was originally brought before the District Court, at the request of the parties, the motion was referred to this Court. Accordingly, this Court has jurisdiction to interpret and enforce the provisions of the Final Decree.

### II.  *Res Judicata, Collateral Estoppel and Abstention*

The matter before this Court is no doubt complicated by the fact that two district courts have already addressed whether claims under CERCLA were discharged in Duplan's bankruptcy proceeding. The Virgin Islands Court was the first court to address the issue. Three (3) years later, a second analysis of the issue was rendered by

---

**3.** Bankruptcy Code § 105(a) provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

the District Court for the Western District of New York in *State of New York v. Panex Indus., Inc.*, No. 94–CV–0400E(H), 1996 WL 378172, at *2 (W.D.N.Y. June 24, 1996) (the "New York Action"). In the New York Action, the State of New York filed a complaint against Panex, the Panex Trust and Panex Trustees, Lazare and Rosenbloom (collectively "Panex Defendants") for common law and CERCLA claims arising out of Duplan's operation of a button manufacturing facility in Wellsville, New York, from 1964 through 1980.

As in the Virgin Islands Court, the Panex Defendants moved to dismiss the State's claims alleging, *inter alia,* that the claims were discharged in Duplan's bankruptcy proceeding. After converting the motion to one for summary judgment, the District Court for the Western District of New York (the "New York Court") denied the motion concluding that "[t]here is no merit to the contention that all or any claims alleged in this case against the Panex [D]efendants were previously discharged in bankruptcy." *Id.* at *4. The court noted that a "claim" for purposes of the bankruptcy must have arisen prior to the filing of the petition and any possible claim under CERCLA arose four years after the petition had been filed. *Id.* The court, ultimately, concluded that there was a genuine dispute of a significant fact warranting a denial of summary judgment because the Panex Defendants' argument that all the claims related to pre-petition releases or threatened releases of hazardous substances "completely fail[ed] to address the allegations of releases caused by post-petition conduct which the State ha[d] adequately substantiated for the purposes of th[e] motion...." *Id.*

While the Oil Companies do not dispute that this Court has jurisdiction to resolve the issues in this proceeding, Texaco argues that Goldman's motion is barred by the Virgin Islands Court's Decision under the doctrines of res judicata and collateral estoppel. Esso also argues that this Court should abstain from this proceeding because: (i) the District Court did not reserve exclusive jurisdiction to enforce its orders; (ii) the discharge issue has already been addressed by the Virgin

Islands Court, as well as, the New York Court; (iii) no prejudice will accrue from abstaining since Goldman can raise the discharge issue as an affirmative defense; (iv) abstention will have no effect on the administration of the estate; and (v) under the "first-filed" rule the district courts should determine the issues.

The Court will first address the binding effect of the Virgin Islands and New York Courts' decisions. Res judicata in its broadest usage embraces both "res judicata" and "collateral estoppel." *See* 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4402, at 6 (1981). The two doctrines, however, are very distinct. *Id.* Res judicata, or claim preclusion, bars a subsequent litigation between the same parties or their privies on the same cause of action. *Anaconda–Ericsson Inc. v. Hessen (In re Teltronics Servs., Inc.),* 762 F.2d 185, 190 (2d Cir.1985). Whereas, collateral estoppel, or issue preclusion, bars a party from re-litigating an issue clearly raised in a prior action and decided against that party or those in privity, regardless of whether the causes of action are the same. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

▪ Both doctrines, however, require a final, valid judgment on the merits. *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 366–68 (2d Cir.1995); *Liona Corp., Inc. v. PCH Assocs. (In re PCH Assocs.),* 949 F.2d 585, 593 (2d Cir.1991). A denial of a motion for summary judgment is not sufficiently final to be given preclusive effect under either res judicata or collateral estoppel. *See* 18 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 131.30[2][c][i] (3d ed.1997) ("denial of a summary judgment motion, cannot be the basis for application of the claim preclusion doctrine"); *Kay–R Elec. Corp. v. Stone & Webster Constr. Co., Inc.,* 23 F.3d 55, 59 (2d Cir.1994) (denial of summary judgment not final for purposes of collateral estoppel). Accordingly, the New York Court's denial of

the summary judgment is not binding on this Court.[4]

■ The Virgin Islands Court's Decision is similarly not binding on this Court. Although the decision was a nonappealable interlocutory order, the Third Circuit reviewed the decision in an appeal from the Virgin Islands Court's Injunction. As stated above, the Third Circuit reversed the injunction and held that because the Laga Defendants were without capacity to be sued, no judgment could be rendered against them and directed that the CERCLA claims against the Laga Defendants be dismissed. Since the Third Circuit held that no judgment could be rendered against the Laga Defendants, the decision is not sufficiently final to be given preclusive effect.

■ Having concluded that the Virgin Islands and New York Courts' decisions are not binding, the Court will determine whether it should abstain from deciding Goldman's motion. It appears that Goldman is "forum-shopping" in the hopes of finding a court that will rule in its favor. This appearance is supported by the odyssey of this issue before arriving in this Court. While this Court does not condone such behavior, the Court agrees that the possibility of inconsistent decisions in the many jurisdictions where Duplan operated manufacturing facilities warrants a final decision by this Court. Moreover, despite the fact that an action was first filed in another district, courts have held that bankruptcy courts are in the best position to interpret and enforce their own orders. *See, e.g., Mesiti v. Microdot, Inc.,* 156 B.R. 113, 118 (D.N.H.1993); *Providence and Worcester R.R. Co. v. Penn Cent. Corp.,* Civ. A. No. 88–2119–MC, 1989 WL 73308, at *3 (D.Mass. June 28, 1989). In fact, rather than abstaining, the District Court referred the matter to this Court to decide. Accordingly, this Court will not abstain from deciding the motion.

### III. *Scope of the Discharge and Permanent Injunction*

Turning to the merits of the case, the Court must determine whether the Final De-

cree discharging the Debtors from all their "debts and liabilities" and enjoining any suits based upon "any right, claim or interest" against the Debtor or Panex, bars the Oil Companies from asserting their claims under CERCLA. Under Chapter X of the Act, once a plan of reorganization was confirmed, the plan and its provisions became binding upon "all creditors and stockholders, whether or not such creditors and stockholder are affected by the plan or have accepted it or have filed proofs of their claims or interests and whether or not their claims or interests have been scheduled or allowed or are allowable." Sec. 224(1), 11 U.S.C. 624(1) (repealed 1979). Any property transferred under a plan was transferred "free and clear of all claims and interests of the debtor, creditors, and stockholders, except such claims and interests as may otherwise be provided for in the plan or in the order confirming the plan...." Sec. 226, 11 U.S.C. 626 (repealed 1979).

Under section 228, once the plan was consummated, the judge was required to enter a final decree "(1) discharging the debtor from all its debts and liabilities ..., *except as provided in the plan or in the order confirming the plan or in the order directing or authorizing the transfer or retention of property;* (2) discharging the trustee, if any; (3) making such provisions by way of injunction or otherwise as may be equitable; and (4) closing the estate." Sec. 228, 11 U.S.C. § 628. (repealed 1979) (emphasis added). As noted in Collier, unless provided in the plan or order confirming the plan, a final decree in a Chapter X proceeding discharged the debtor from all rights and interests of creditors "including liabilities incurred during reorganization" and "holders of claims or interests not filed or scheduled in the case or who had no notice of it." 6A COLLIER ¶ 11.18, at 300.

Chapter X defined: "creditor" as the "holder of any claim"; "debts" as "all

---

**4.** Since this Court concludes that the New York Court decision is not final, the Court need not address Esso's contention that collateral estoppel precludes Rosenbloom and Lazare from joining Goldman's motion because they are parties to the New York Action. In any event, Rosenbloom and Lazare join in Goldman's motion as shareholders and distributees of Panex assets and not as the trustees of Panex.

claims"; and "claims" as "all claims of whatever character against a debtor or its property, except stock, whether or not such claims are provable under section 63 of this Act and whether secured or unsecured, liquidated or unliquidated, fixed or contingent." Sec. 106, 11 U.S.C. § 506 (repealed 1979). As in the present day definition of a "claim," the definition of a "claim" under Chapter X of the Act was sweeping in scope. 6 COLLIER ¶ 2.05, at 306. It was, in fact, "a more inclusive definition than that applicable in ordinary bankruptcy, and ... [was] given a broad construction with respect to claims and creditors in order to dispose of all liabilities of the debtor in reorganization." *Id.; see also Matter of Stirling Homex Corp.,* 579 F.2d 206, 212 (2d Cir.1978), *cert. denied sub nom.* 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979); *G.F. Wertime, Inc. v. Turchick,* 358 F.2d 802, 811 (2d Cir.1966).

In the case at bar, the Plan specifically defined "Creditor" as the "holder of a Claim" and "Claim" as:

> Any claim against either of the Debtors or the property of either of the Debtors, whether or not provable under Section 63 of the Bankruptcy Act, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, which *arose prior to the filing by the Debtors of the Petitions,* proof of which was filed on or before July 10, 1979, or such other date as designated by the Court, and which has been or is hereafter allowed by the Court....

Plan Art. II (emphasis added). The Plan defined "Administrative Creditors" as the "holders of Administrative Claims" and "Administrative Claims" as:

> All costs and expenses of administration in connection with the Reorganization Cases including, without limitation, compensation, to the extent allowed by the Court, of the Trustee, the Trustee's attorneys, accountants and agents, and any parties in interest and their attorneys, except (i) interim allowances paid on account of services rendered prior to the Confirmation Date and (ii) all other costs and expenses incurred by the Debtors–in–Possession or the Trustee in the normal course of operating

the businesses of the Debtors and paid prior to the Confirmation Date.

Plan Art. II.

Pursuant to the Plan, all Creditors whose Claims were allowed received distributions on their Claims in accordance with Article I of the Plan. The Plan further provided that Administrative Creditors would "be paid in full in cash, provided, however, that those Administrative Claims representing the Trustee's liabilities incurred in operating the business of the Debtors in the ordinary course, [would] be *assumed by Duplan for payment in the ordinary course of business.*" Plan Art. V, § 5.1 (emphasis added). The Plan also provided that the Trustee "set aside a fund reasonably estimated to be sufficient for the payment of Administrative Claims, other than the normal costs and expenses of operating the Debtors which shall be assumed by Duplan." Plan Art. XII, § 12.6.

■ Further, the Discharge and Permanent Injunction provisions in the Final Decree discharged the Debtors from "all of their debts and liabilities, ... except as provided herein or in the Plan" and perpetually enjoined and restrained all future suits against the Debtors or Reorganized Corporation "based upon any right, claim or interest ..., *excepting only such liabilities and claims as such Debtors or said Reorganized Corporation have expressly assumed* or agreed to pay pursuant to the Plan herein or the order confirming the Plan." *See* Final Decree, as amended by *Ex Parte Order* dated December 16, 1983, ¶¶ 2 and 7 (emphasis added). Consistent with the definition of "Claim" in the Plan, this Court concludes that the Discharge in the Final Decree only discharged claims that arose "prior to the filing" of the Debtor's petition.

■ Accordingly, a determination of whether the CERCLA Claims were discharged in Duplan's bankruptcy falls on whether they "arose" before the filing of the Debtors' petition. Goldman argues that because the claims stem from "releases or threatened releases" into the environment which occurred before Duplan's emergence from bankruptcy, the claims constitute pre-

petition claims that were discharged in bankruptcy. Esso contends that the claims were not discharged because they did not exist prior to filing of Duplan's petition since CERCLA had not yet been enacted. Without addressing Duplan's pre-petition operations, Texaco argues that any claims arising from Duplan's post-petition operation of the Laga Facility constituted Administrative Claims that were not discharged under the express terms of the Plan.

Regardless of the binding effect of the Virgin Islands and New York Courts' decisions, this Court agrees that the CERCLA claims did not arise until CERCLA's enactment in 1980. In reaching its decision, the Virgin Islands Court relied on the Third Circuit's decision in *Matter of Penn Central Transp. Co.*, 944 F.2d 164 (3d Cir.1991), *cert. denied*, 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992). Goldman argues that the Virgin Islands Court incorrectly relied on *Penn Central*, rather than the Second Circuit's decision in *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997 (2d Cir.1991) (hereinafter referred to as "*Chateaugay I*").

In *Penn Central*, a third-party action was filed against a reorganized railroad for contribution and indemnity under CERCLA for alleged contamination related to the debtor's pre-petition operations. 944 F.2d 164. The court held that because a consummation order and final decree, which closed the estate and enjoined future lawsuits against the debtor based on "any right, claim or interest of any kind or nature whatsoever" was entered in 1978 and CERCLA was not enacted until 1980, the "asserted claims under CERCLA did not constitute dischargeable claims within the meaning [of the Act] ... and thus survive the discharge of the debtor." *Id.* at 168. According to the court, no legal relationship could have existed between the parties prior to the enactment of CERCLA and, therefore, the claims were neither contingent or matured under the Act's definition of "claim."[5] *Id.*

In the same year *Penn Central* was decided, the Second Circuit decided *Chateaugay I.*

944 F.2d 997. In *Chateaugay I*, the Second Circuit held that response costs under CERCLA for the pre-petition release or threatened release of hazardous waste, regardless of when the costs were incurred, were pre-petition "claims" within the meaning of the Bankruptcy Code and were, therefore, dischargeable in bankruptcy. *Id.* Unlike the debtor in *Penn Central*, however, the debtor in *Chateaugay I*, filed its petition in 1986 under the Bankruptcy Code and after the enactment of CERCLA. *Id.* Thus, a legal relationship under CERCLA could have existed prior to the filing of the debtor's petition.

In a more recent decision, the Second Circuit relied on the analysis in *Penn Central* and held that a statutory claim cannot exist prior to the enactment of the statute giving rise to the claim. *LTV Steel Co., Inc. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478 (2d Cir.1995) (hereinafter referred to as "*Chateaugay II*"). In *Chateaugay II*, the debtor sought a declaratory judgment that its obligations to contribute to a retiree health and benefit plan under the Coal Act of 1993 constituted pre-petition claims that must be disallowed because no timely proof of claim had been filed. As in the instant case, the Coal Act had been enacted after the filing of the debtor's petition and before the plan was confirmed. *Id.* at 497. Relying on *Penn Central*, the Second Circuit held that because the Coal Act was enacted six years after the debtor filed its petition, the debtor's obligations did not constitute pre-petition claims that could be disallowed as untimely. *Id.* According to the court "where the statute imposing the liability has not been enacted, 'it would be impossible to find even the remotest right to payment'" that would give rise to a "contingent" claim under the Code. *Id.* The court, instead, concluded that the obligations that accrued during the pendency of the bankruptcy constituted a tax entitled to treatment as an administrative expense. *Id.* at 498.

Following the analysis of both *Penn Central* and *Chateaugay II*, this Court concludes that the claims at issue here, did not come

---

**5.** Although *Penn Central* involved the reorganization of a railroad under Chapter VIII of the Act, the relevant provisions of that chapter are substantially similar to Chapter X of the Act.

into existence until CERCLA's enactment in 1980, after the filing of Duplan's petition and after the last day to file claims against the estate. Accordingly, the claims were not discharged.

■ Goldman's argument that the Permanent Injunction enjoined the Oil Companies from bringing their claims, whether or not the claims had been discharged, is of no merit. The purpose of the injunction was to protect the provisions of the Final Decree. *See Evans v. Dearborn Mach. Movers Co., Inc.,* 200 F.2d 125, 128 (6th Cir.1953). If the Permanent Injunction enjoined claims whether or not they had been discharged there would be little need for the Discharge provision in the decree. Moreover, the Permanent Injunction specifically excepted from the injunction liabilities or claims expressly assumed by the Debtors or the Reorganized Corporation in the Plan. As stated above, Administrative Claims representing liabilities incurred by the Trustee in operating the business of the Debtors were expressly "assumed" by Duplan in the Plan. Since the liabilities, here, arose during the reorganization, the Court concludes that the CERCLA Claims fall outside the protection of the Permanent Injunction and Discharge provisions of the Final Decree.

## CONCLUSION

In light of the foregoing, Goldman's motion to enforce the Permanent Injunction in the Final Decree is denied.

THE ATTORNEYS FOR ESSO ARE TO SETTLE AN ORDER CONSISTENT WITH THIS OPINION ON FIVE (5) DAYS NOTICE.