# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 10-2393

_____

| | |
|---|---|
| Carlos Sanchez, | * |
| | * |
| Appellant, | * |
| | * |
| | *   Appeal from the United States |
| v. | *   District Court for the District of |
| | *   Minnesota. |
| Northwest Airlines, Inc., aka NWA, | * |
| a domestic corporation; | * |
| Delta Air Lines, Inc., a foreign | * |
| corporation doing business in | * |
| Minnesota, | * |
| | * |
| Appellees. | * |

_____

Submitted: February 17, 2011
Filed: October 14, 2011

_____

Before WOLLMAN and BYE, Circuit Judges, and FLEISSIG,[1] District Judge.

_____

BYE, Circuit Judge.

Carlos Sanchez brought a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, alleging his employer, Northwest Airlines, Inc. ("Northwest"), engaged in prohibited disability discrimination by rescinding

_____

[1]The Honorable Audrey G. Fleissig, United States District Judge for the Eastern District of Missouri, sitting by designation.

Sanchez's offer of promotion on the basis of his perceived physical limitations. Northwest moved for summary judgment contending, in part, that Sanchez's claim was discharged in the company's Chapter 11 bankruptcy, which had concluded two months after rescission of Sanchez's offer. Siding with Northwest, the district court held Sanchez's ADA claim was discharged by virtue of his failure to submit a request for payment by July 30, 2007, the bar date for the majority of administrative expense claims. Because Sanchez was not required to file a request for payment of an administrative expense at all, we reverse the judgment in favor of Northwest and remand for further proceedings.

I

Sanchez has been employed with Northwest for the past twenty years. Since 1994, he worked as an equipment service employee (ESE) alternating between the Minneapolis-St. Paul and the Honolulu International Airport. The position required Sanchez and other ESEs to handle luggage and cargo; clean both the interior and the exterior of the airplanes, ramp equipment, and other airport facilities; service the aircraft and automotive equipment with fuel and oil; and perform a variety of other tasks associated with servicing aircrafts and airport facilities.

As a result of a work-related injury sustained in 2001, Sanchez had to undergo a knee replacement surgery two years later. Following the 2003 surgery, Sanchez returned to work with some restrictions. Among them were restrictions on squatting, crawling, or ladder climbing documented in a functional capacity evaluation conducted at Northwest's insistence and verified by Sanchez's personal physician, Dr. Calvin Oishi. In addition, Dr. Oishi placed Sanchez on a permanent restriction against lifting more than seventy-five pounds. As Sanchez recuperated, Dr. Oishi revised the scope of Sanchez's work restrictions, relaxing the initial prohibition on ladder climbing and crawling on one occasion in response to Northwest's inquiry.

In January 2007, Sanchez was selected for a position as a Lead ESE at the Honolulu airport. The job included a significant supervisory component consisting of assigning, leading, and directing the work of ESE crews, but also required performance of regular ESE duties as necessary. Although Sanchez denies having requested any accommodations in connection with his new or, for that matter, previous position, Northwest initiated an "accommodation assessment" of his physical limitations out of concern that "permanent work-related restrictions previously placed on [Sanchez] may impact [his] ability to perform certain essential functions of this particular position as a Lead ESE at HNL." Appellant App'x at 98. On the basis of this assessment, conducted by telephone, Northwest rejected Sanchez's "request" to absolve him from the responsibilities of loading and unloading luggage from inside the aircraft bins. On March 30, 2007, Northwest officially rescinded Sanchez's offer of employment as a Lead ESE.

After exhausting his intra-union grievances and administrative remedies with the Equal Employment Opportunity Commission, Sanchez received a right-to-sue letter on August 15, 2007, and filed the present action on November 13, 2008. Meanwhile, Northwest had emerged from a Chapter 11 bankruptcy less than a year earlier. Together with its parent corporation and certain subsidiaries, Northwest requested bankruptcy protection under Chapter 11 from the United States Bankruptcy Court for the Southern District of New York on September 14, 2005. The company's creditors were given until August 16, 2006, to file regular proofs of claim. On May 18, 2007, the bankruptcy court entered an order confirming Northwest's plan of reorganization effective May 31, 2007. At the same time the reorganization plan went into effect, the court approved the Notice of Bar Date of July 30, 2007, for the Filing of Administrative Expense Claims.

The notice defined administrative expenses as

> any right to payment, whether secured or unsecured, constituting a cost or expense of administration of any of the chapter 11 cases under sections 330, 503(b), 507(a)(1) and 1114(e) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the chapter 11 cases including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, and any allowance of compensation and reimbursement of expenses. . . .

Appellant Br. Addendum 3. Excluded from the duty to file a request for payment were five groups of administrative expenses, including "[l]iabilities incurred in the ordinary course of business by the Debtors."

Northwest mailed the notice of the administrative expenses bar date to its creditors and all of its employees between June 1 and June 4, 2007. With respect to Sanchez specifically, Northwest presented the Affidavits of Mailing documenting the mailing of the relevant bankruptcy notices to Sanchez's address in Hawaii. Although Sanchez acknowledges receipt of the initial notice of Northwest's bankruptcy filing, he denies receiving any other correspondence concerning the bankruptcy.

Having focused the parties' briefs at the summary judgment stage on the issue of bankruptcy discharge, the district court concluded Sanchez's failure to submit a request for payment by the administrative expenses deadline resulted in the discharge of his claim. In the present appeal, Sanchez argues he did not receive an adequate notice of the relevant bankruptcy deadlines so as to suffer the discharge of his claim. He also takes issue with the district court's characterization of his claim as an administrative expense; the court's reliance on McSherry v. Trans World Airlines,

-4-

<u>Inc.</u>, 81 F.3d 739 (8th Cir. 1996), to justify the finding of the discharge; and the court's denial of equitable relief.

II

"The principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor." <u>Marrama v. Citizens Bank of Mass.</u>, 549 U.S. 365, 367 (2007) (citation and internal quotation marks omitted). With respect to Chapter 11 reorganization in particular, the objective is "to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders." <u>In re Cedar Shore Resort, Inc.</u>, 235 F.3d 375, 379 (8th Cir. 2000); <u>Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.</u>, 554 U.S. 33, 51 (2008) (Chapter 11 bankruptcy "strikes a balance between a debtor's interest in reorganizing and restructuring its debts and the creditors' interest in maximizing the value of the bankruptcy estate"). Once the plan of reorganization is confirmed, it "binds each of the creditors and parties in interest, leaves the property with the debtor free of claims and interests, and effects a discharge of the unpaid portion of debts." Richard I. Aaron, Bankruptcy Law Fundamentals, § 1:9 (citing 11 U.S.C. § 1141(d)(1)(A)).

A

Generally, the bankruptcy court's entry of the confirmation order "discharges all debts arising prior to the date of confirmation." <u>U.S. Commodity Futures Trading Comm'n v. NRG Energy, Inc.</u>, 457 F.3d 776, 779 (8th Cir. 2006). Under the Bankruptcy Code, a "debt" means "liability on a claim." 11 U.S.C. § 101(12). The term "claim" is, in turn, defined broadly, <u>Johnson v. Home State Bank</u>, 501 U.S. 78, 83 (1991), and includes a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). In <u>McSherry v. Trans World Airlines, Inc</u>, this court held a cause of action that accrues

-5-

prior to the confirmation of the plan constitutes a "claim" dischargeable upon confirmation even if it lacks some jurisdictional prerequisite for proceeding in court, like exhaustion. 81 F.3d at 741 (employee's cause of action under the ADA constituted a "claim" under § 101(5)(A) of the Bankruptcy Code where employee was terminated and his legal claim therefore accrued prior to confirmation, even though he did not yet receive a right-to-sue letter and could not therefore proceed in court). By analogy, Sanchez's cause of action, which had accrued but had not been fully exhausted prior to the confirmation of Northwest's reorganization plan on May 31, 2007, matured into a "claim" within the meaning of § 101(5)(A) at the time Northwest rescinded his promotion on March 31, 2007.

Nevertheless, McSherry does not compel the conclusion that Sanchez's claim was discharged upon confirmation. The operation of the Bankruptcy Code, including its discharge provisions, is subject to due process constraints. Ginsberg v. Lindel, 107 F.2d 721, 726 (8th Cir. 1939); Broomall Indus., Inc. v. Data Design Logic Sys., Inc., 786 F.2d 401, 403 (Fed. Cir. 1986) (stating "Fifth Amendment due process considerations take precedence over the discharge provisions of section 1141 of the Bankruptcy Code"). "[B]efore a pre-petition or pre-confirmation claim can be discharged under the applicable provisions of the Bankruptcy Code, a debtor's creditors must be afforded notice of the debtor's bankruptcy case, as well as the deadline for asserting any pre-petition claims against the debtor." Zurich Am. Ins. Co. v. Tessler (In re J.A. Jones, Inc.), 492 F.3d 242, 249 (4th Cir. 2007). Absent such notice, creditors lack "the opportunity to participate in a meaningful way in the course of bankruptcy proceedings." In re Hairopoulos, 118 F.3d 1240, 1244 (8th Cir. 1997). According to a landmark Supreme Court case, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314-15 (1950).

These principles come in handy when evaluating the chronology of events in Sanchez's case.  By the time Sanchez's claim accrued in March 2007, the August 16, 2006, deadline for regular creditors to submit proofs of claim had long passed.  The bankruptcy proceedings were coming to an end, with only two months remaining until the confirmation of the plan.  As this court explained before,

> [T]he addition of a creditor, at a late stage in a case, is inherently problematic [because] creditors have a right to adequate notice and the opportunity to participate in hearings/meetings in the course of a bankruptcy case, e.g., the meeting of creditors, the confirmation hearing, and/or other processes, such as the proof of claim process, before disallowance or discharge of their claims.

In re Hairopoulos, 118 F.3d at 1245 (citation and internal quotation marks omitted).  Because the notice of the bar date was sent to all regular creditors on June 14, 2006, nine months prior to Northwest's rescission of Sanchez's promotion, it did not "afford a reasonable time for [Sanchez] to make [his] appearance."  Mullane, 339 U.S. at 314; see also In re Smith, 582 F.3d 767, 779 (7th Cir. 2009) (describing the key function of notice as affording an "opportunity to file a proof of claim and . . . request a determination of nondischargeability"); Zilog, Inc. v. Corning (In re Zilog, Inc.), 450 F.3d 996, 1001-02 (9th Cir. 2006) (speaking of "manifest injustice" of discharging claims that could not have been presented).  It comes as no surprise, then, that the district court focused its due process analysis on the notice of the deadline for filing administrative expenses.  That notice was the only one that could have satisfied Northwest's due process obligations to Sanchez.  Therefore, and unlike the claim in McSherry, Sanchez's claim  survived the plan confirmation.

B

The rub is whether Sanchez's claim survived after he failed to present it by the administrative expenses bar date.  The answer to this question, as we see it, lies in the

close analysis of the text of the notice requiring submission of administrative expense claims by July 30, 2007, as well as concessions by Northwest. See Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 211 n.20 (3d Cir. 2006) (explaining a court of appeals has discretion to rely on the party's concessions in pleadings or briefs). The notice invited submission of claims for administrative expenses, defined as

> any right to payment, whether secured or unsecured, constituting a cost or expense of administration of any of the chapter 11 cases under sections 330, 503(b), 507(a)(1) and 1114(e) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the chapter 11 cases including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, and any allowances of compensation and reimbursement of expenses. . . .

Appellant Br. Addendum 3.

The notice went on to add that no proofs of claim were required for the following five categories of administrative expenses:

a. Liabilities incurred in the ordinary course of business by the Debtors;

b. Liabilities arising under loans or advances to or incurred by the Debtors;

c. Post-petition Aircraft Purchase and Lease Obligations;

d. Liabilities arising under the Rights Offering Sponsor Agreement and the registration rights agreement entered into in connection therewith; and

e.     Claims accruing post-petition under an assumed collective bargaining agreement or imposed terms, whether ordinary course claims or grievances.

Id.

The overall effect of this notice was to create a bar date for the majority of administrative expenses under § 503(b).  See id. ("Any requests for payment of Administrative Expense Claims that are not properly filed and served by the Administrative Expense Claim Bar Date . . . will be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors or any action by the Bankruptcy Court.").  Although the Code itself chose not to do so, Northwest can force creditors to comply with this bar date or face a discharge.  Caradon Doors & Windows, Inc. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.), 447 F.3d 461, 465 (6th Cir. 2006).  In order to "facilitate the rehabilitation of insolvent businesses by encouraging third parties to provide those businesses with necessary goods and services," Nat'l Union Fire Ins. Co. v. VP Bldgs., Inc., 606 F.3d 835, 838 (6th Cir. 2010), claims for administrative expenses are accorded priority over pre-petition unsecured claims.

The Bankruptcy Code itself does not provide an exhaustive list of claims that qualify as administrative expenses, In re Burival, 613 F.3d 810, 812 (8th Cir. 2010), but merely states they include, among other things,

the actual, necessary costs and expenses of preserving the estate including –

(i) wages, salaries, and commissions for services rendered after the commencement of the case; and

(ii) wages and benefits awarded pursuant to a judicial proceeding or a proceeding of the National Labor Relations Board as back

pay attributable to any period of time occurring after commencement of the case under this title, as a result of a violation of Federal or State law by the debtor, without regard to the time of the occurrence of unlawful conduct on which such award is based or to whether any services were rendered, if the court determines that payment of wages and benefits by reason of the operation of this clause will not substantially increase the probability of layoff or termination of current employees, or of nonpayment of domestic support obligations, during the case under this title.

11 U.S.C. § 503(b)(1)(A).

In Reading Co. v. Brown, the Supreme Court held post-petition tort claims – specifically, ones arising from the negligence of a trustee acting within the scope of his authority – are "costs ordinarily incident to operation of a business," and therefore qualify as administrative expenses entitled to priority under § 503(b). 391 U.S. 471, 483-85 (1968) (allowing administrative expense priority status for a claim of damages incurred in fire caused by the trustee's negligence). The Court arrived at its conclusion after balancing the objective of the debtor's rehabilitation against the desirability of allowing those injured by the operation of the business during the bankruptcy process to recover ahead of those for whose benefit the business was carried out. Id. at 482-83. Reading represents a limited exception to the general rule that, to fit within § 503(b), expenses must (a) confer "an actual and demonstrable benefit [on] the debtor's estate, the creditors, and to the extent relevant, the stockholders," In re Flight Transp. Corp. Secs. Litig., 874 F.2d 576, 581-82 (8th Cir. 1989), and (b) arise from a transaction with a bankruptcy estate, In re Eagle-Picher Indus., Inc., 447 F.3d at 464; Peters v. Pikes Peak Musicians Ass'n, 462 F.3d 1265, 1268 (10th Cir. 2006); In re FBI Distrib., 330 F.3d 36, 42 (1st Cir. 2003); Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999); Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d 98, 101 (2d Cir. 1986); In re Jartran, Inc., 732 F.2d 584, 587 (7th Cir.

1984).  See In re Zilog, Inc., 450 F.3d at 999 n.1 (characterizing Reading as an exception to the rule limiting administrative expenses to ones arising out of transaction with debtor in possession).

To be clear, however, Reading defines administrative expenses for the purposes of priority status under § 503, which differ from the purposes of dischargeability.  See Boeing N. Am., Inc. v. Ybarra (In re Ybarra), 424 F.3d 1018, 1025 (9th Cir. 2005). While the purpose of administrative expense priority is "to encourage third parties to contract with the bankruptcy estate for the benefit of the estate as a whole," the inquiry in the discharge context is "whether the debtor should be released from pre-petition debts so that she can be given a 'fresh start.'"  Id. at 1026 ("The discharge inquiry involves the existence of personal liability, while administrative expense priority concerns the distribution of assets from a limited pool.").  Thus, Reading's rationale to benefit creditors with claims against the insolvent entity would be undercut, not furthered, by the rule permitting discharge of such claims if not submitted by the bar date created by the debtor.

Still, even if we accept Reading as a command to count Sanchez's ADA claim as an administrative expense for the purposes of discharge, compare In re Zilog, 450 F.3d at 999 n.1 ("under Reading and its progeny, discrimination claims that arise post-petition but pre-confirmation can be filed as administrative expenses against the debtor's estate"), with Cross v. K.B. Toys, No. 05-C-6137, 2006 WL 2437831, at *4 (N.D. Ill. Aug. 22, 2006) (refusing to treat the plaintiff's Title VII claim as an administrative expense because she could not support the notion that "retaliation was in any way conducted to preserve the bankruptcy estate as required to show the existence of an administrative expense claim"), we cannot conclude Sanchez's claim was discharged as a result of his failure to submit a request for payment by the administrative expenses bar date.  The notice of the administrative expenses bar date carved out an exception from the request-for-payment filing requirement for "[l]iabilities incurred in the ordinary course of business by the Debtors."  Northwest

argues in its brief that Sanchez's ADA claim was the ordinary course indebtedness. See Red Br. at 28-30. We agree with Northwest's characterization and, accordingly, conclude Sanchez did not have to file a request for payment by the administrative expenses deadline at any time.

In reaching this conclusion, we are not breaking new ground. This court, too, has previously found "Administrative Claims based on liabilities incurred by a debtor in the ordinary course of its business" to encompass post-petition tort claims against the debtor. Fieber's Dairy, Inc. v. Purina Mills, Inc., 331 F.3d 584, 587 & n.1 (8th Cir. 2003). The court remanded the matter to the district court for the interpretation of the reorganization plan in light of the relevant extrinsic evidence. Id. at 587. On remand, the district court reconfirmed the relevant language to encompass the negligence claim such as the plaintiff's, regardless of the intent of the plan drafter. Fieber's Dairy, Inc. v. Purina Mills, Inc., No. 01-1026, Order (D.S.D. Aug. 18, 2003).

Other courts have interpreted analogous language similarly. In Matter of Eagle-Picher Industries, Inc., for example, the Sixth Circuit concluded "liabilities incurred in the ordinary course of business by any of the Debtors in possession" included claims for patent infringement, as well as tort and contract claims, stemming from post-petition sales of the debtor's products to third parties. 447 F.3d at 465-66. Citing Reading, the court rejected the idea that the phrase is limited to, strictly speaking, day-to-day expenses incurred by the debtor. Id. The court understood the phrase at issue to cover not only liabilities arising out of the debtor's affirmative duties under the contracts but also "any failure on its part to perform its explicit and implicit obligations under the contracts governing these transactions." Id. at 466.

Similarly, in Goldman, Sachs & Co. v. Esso Virgin Islands, Inc. (In re Duplan Corp.), the Second Circuit held claims for environmental damage and cleanup costs constituted qualifying "Administrative Claims representing the Trustee's liabilities incurred in operating the business of the Debtors in the ordinary course," which were

assumed by the debtor under the terms of the reorganization plan. 212 F.3d 144, 155 (2d Cir. 2000) (quoting In re Duplan Corp., 209 B.R. 324, 331 (Bankr. S.D.N.Y. 1997)). Finally, a third court classified tort claims arising out of accidents and cargo losses incurred by the debtor's employees during pendency of the Chapter 11 bankruptcy as "liabilities incurred in the ordinary course of business by the Debtors post-petition" that had to be paid out of the liquidation fund set aside for this purpose. In re Gainey Corp., 447 B.R. 807, 812 (Bankr. W.D. Mich. 2011).

The Internal Revenue Service's regulation on what constitutes ordinary course indebtedness in a title 11 bankruptcy case is also telling. According to that regulation, quoted by Northwest in its brief, see Red Br. at 29-30, indebtedness arises in the ordinary course of business

> only if the indebtedness is incurred by the loss corporation in connection with the normal, usual, or customary conduct of business. . . . For example, indebtedness . . . arises in the ordinary course of the loss corporation's trade or business if it is trade debt; a tax liability; *a liability arising from a past or present employment relationship*, a past or present business relationship with a supplier, customer, or competitor of the loss corporation, a tort, a breach of warranty, or *a breach of statutory duty . . . .*

26 C.F.R. § 1.382-9(d)(2)(iv) (emphases added).

Sanchez's ADA claim fits squarely within the definition of "[l]iabilities incurred in the ordinary course of business by the Debtor[]," as interpreted by this and other circuits. It arises out of the regular employment relationship between the debtor and its employee, and involves, for now in theory, a breach of a statutory duty not to discriminate. Without this relationship, the debtor could not continue to function and meet its obligations to customers. No doubt, the company did not need to engage in prohibited acts of discrimination to meet its goals. But cases like Reading, Fieber's

Dairy, and Eagle-Picher Industries teach us this is the wrong prism to use in looking at the situation. Rather than focus on what went wrong, we must look at the utility of the underlying exercise – in this case, engaging an employee to perform the duties of a Lead ESE. Because this activity is necessary to carry out Northwest's day-to-day operations, we agree with Northwest it is properly viewed as a "[l]iabilit[y] incurred in the ordinary course of [Northwest's] business."

As a minimum, this conclusion bears on the sufficiency of the notice received by Sanchez. The district court characterized the notice, we think fairly, as "dense with legalese." Our ruling today confirms that, even if Sanchez consulted an attorney concerning the scope of this notice (and it is not a foregone conclusion he was expected to do so, cf. Brody v. Vill. of Port Chester, 434 F.3d 121, 131-32 (2d Cir. 2005) (requiring that, to the extent practicable, notice of condemnation proceedings be accessible to a reasonable condemnee); Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.), 810 F.2d 270, 279-80 (D.C. Cir. 1987) (suggesting the extent of the recipient's expected reliance on legal help is dictated by particular circumstances of delivery of the notice)), an attorney would be justified in advising Sanchez not to file a request for payment of an administrative expense because his claim fell within one of the five exceptions. Under these circumstances, Sanchez did not receive a notice fairly apprising him of the possibility his claim would be discharged if not submitted by the bar date. See Fogel v. Zell, 221 F.3d 955, 962 (7th Cir. 2000) ("If the notice is unclear, the fact that it was received will not make it adequate."). Without expressing any view on Sanchez's alternative arguments, we thus conclude Sanchez's claim under the ADA was not discharged in Northwest's bankruptcy.

III

For these reasons, we reverse summary judgment in favor of Northwest and remand for further proceedings.

_____