# United States Court of Appeals
## For the First Circuit

No. 24-1776

JIMMY VILLALOBOS-SANTANA; JIMMY COLÓN-RODRÍGUEZ,

Plaintiffs, Appellants,

v.

PUERTO RICO POLICE DEPARTMENT,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Barron, Chief Judge,
Thompson and Aframe, Circuit Judges.

John E. Mudd, with whom Law Offices John E. Mudd was on brief, for appellants.

Luis R. Román-Negrón, with whom Omar Andino-Figueroa, Puerto Rico Department of Justice, and Roman Negron Law PSC were on brief, for appellee.

April 2, 2026

**BARRON**, <u>Chief Judge</u>.  The United States District Court for the District of Puerto Rico permanently stayed the claims that two individuals brought against their former employer, the Puerto Rico Police Department.  It also "permanently enjoined" the plaintiffs from "continuing" their actions to recover on those claims.  The District Court did so because it concluded that the claims had been discharged under Puerto Rico's financial reorganization plan, which was confirmed pursuant to the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").  The plaintiffs -- Jimmy Villalobos-Santana and Jimmy Colón-Rodríguez -- contend that the District Court erred in so ruling.  We affirm, although on different grounds than those on which the District Court relied.

**I.**

In response to a fiscal crisis in Puerto Rico, Congress enacted PROMESA in 2016.  <u>See</u> Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016) (codified in scattered sections of 48 U.S.C.).  That law authorized, among other things, the Commonwealth to file for reorganization in a specially designated court.  <u>See</u> 48 U.S.C. §§ 2162, 2164, 2166, 2168.  This court is commonly referred to as the "Title III" court, in reference to the title in PROMESA providing for Puerto Rico's reorganization and for the specially designated court's jurisdiction.  <u>See</u> Puerto Rico Oversight,

- 2 -

Management, and Economic Stability Act, Pub. L. No. 114-187, § 1, 130 Stat. 549, 549-50 (2016); In re Fin. Oversight & Mgmt. Bd. for P.R., 77 F.4th 49, 56 (1st Cir. 2023). PROMESA incorporates various provisions of the Bankruptcy Code, including -- as will become relevant -- 11 U.S.C. §§ 105, 503(b), 507(a)(2), and 944. See 48 U.S.C. § 2161.

In May 2017, the Commonwealth of Puerto Rico filed for reorganization under PROMESA. See In re Fin. Oversight & Mgmt. Bd. for P.R., 77 F.4th at 56. Thereafter, on February 15, 2018, the Title III court set a deadline that was subsequently extended to June 29, 2018, for filing pre-petition "proof of claims" against Puerto Rico (the "pre-petition bar date").

Then, on January 18, 2022, after accounting for the claims that had been filed by the deadline (as well as other financial matters), the Title III court finalized and confirmed Puerto Rico's reorganization plan, the so-called Plan of Adjustment ("Plan"). The Plan provides that as of the "Effective Date" -- which was March 15, 2022 -- Puerto Rico is "discharged and released" from all claims and "debts that arose, in whole or in part, prior to the Effective Date" if they had not otherwise been provided for in the Plan. The Plan also provides that, as of the Effective Date, individuals and entities possessing discharged claims "are permanently enjoined[] from . . . commencing or continuing" actions to recover on those claims.

- 3 -

The Plan gave individuals and entities holding claims that constitute "administrative expenses" ninety additional days from the Effective Date to file proof of those claims to potentially receive compensation from Puerto Rico. That deadline was initially June 13, 2022, and was extended at least once for a certain subset of claims that could qualify as administrative expenses ("administrative claims bar date"). The Plan also provided that if individuals or entities holding such administrative expense claims failed to file proof of them by the administrative claims bar date, they -- like the rest of the pre-Effective Date claimants -- would be "forever barred, estopped, and enjoined from asserting such" claims.

While these reorganization proceedings were ongoing, on July 4, 2021, Villalobos-Santana and Colón-Rodríguez (together, "plaintiffs") filed the suit that gives rise to this appeal. It names as the defendant the Puerto Rico Police Department ("the Department").[1] The operative complaint alleges violations of 42 U.S.C. § 2000 et seq., based on the Department having illegally retaliated against them for filing complaints against the

_____

[1] The plaintiffs and the Department both list additional defendants on the cover pages of their briefs to this Court, but the plaintiffs' operative complaint only identifies the Department as a defendant.

- 4 -

Department with the U.S. Equal Employment Opportunity Commission ("EEOC").

The alleged facts underlying the claims are as follows.

A supervisor discriminated against Villalobos because of his age, and after Villalobos filed a complaint about this age discrimination with the EEOC, the Department began "a pattern of retaliation" against him. This retaliation included eliminating some of his "off-duty days," withdrawing "his authority as to subordinates," disarming him "for no reason," and "plac[ing] [him] in the most dangerous shift while he was unarmed."

Subsequently, Colón provided testimony in support of Villalobos's complaints against the supervisor. After providing this testimony, the Department began retaliating against Colón too. This retaliation included changing his shift to "a much more dangerous period of time," failing to give him certain required days off without "any reason," and "filing a false administrative complaint" against him.

For more than two years after the Title III court confirmed the Plan, the Department litigated in the plaintiffs' case like any other case -- discovery began, the plaintiffs survived a summary judgment motion, and the District Court calendared a pre-trial conference.

Then, on May 6, 2024, before the trial in the District Court had begun, the Department filed a "Notice of Injunction."

In that filing, the Department contended that the plaintiffs had not filed proof of their claims against it in the Title III court before the Plan's pre-petition bar date and also had not filed a claim for administrative expenses by the administrative claims bar date. Accordingly, the Department contended that the claims had been discharged under the Plan, thereby requiring that they be permanently stayed and enjoined from going forward. The Department filed the Notice of Injunction after the District Court partially denied summary judgment and began moving the parties toward trial.

In opposing the Notice of Injunction, the plaintiffs countered that, "[i]t is a princip[le] of bankruptcy that claims that occur after the filing of the petition are not covered by the stay or the proceedings." Thus, they contended, their claims against the Department should not have been discharged based on no proof of claim having been timely filed because the "causes of action" in their case arose after Puerto Rico filed its reorganization petition. And, they also argued, their claims could not have been discharged as unclaimed "administrative expenses" because their claims did not qualify as such. Accordingly, they argued, the District Court had no basis to permanently stay or enjoin their claims against the Department. The plaintiffs also argued that the District Court should apply judicial estoppel to bar the Department from attempting to permanently stay and enjoin their claims. In support of this request, they argued that the

- 6 -

Department acted inconsistently by litigating the case for years and then -- only after failing to have the case dismissed -- attempting to have the claims enjoined and stayed on the grounds that the Plan barred the claims.

On June 5, 2024, the District Court granted the Department's request set forth in their Notice of Injunction. It therefore (1) permanently stayed the case and (2) permanently enjoined the plaintiffs "from continuing with any such claims . . . unless and until the [Title III court] modifies the injunction." The District Court explained that the Plan provides that (1) Puerto Rico is "discharged and released" from all claims and debts that "arose, in whole or in part, prior to the Effective Date" and (2) that individuals and entities possessing such discharged claims "are permanently enjoined" from "commencing or continuing" actions to recover on those claims. The District Court then noted that the claims at issue must have arisen at least in part before the Effective Date because the complaint had been filed before the Effective Date, and that, as such, the claims were discharged under the Plan because no timely proof of claim had been filed for those claims. The District Court did not address the plaintiffs' judicial estoppel argument in this ruling.

Subsequently, the plaintiffs filed a motion to alter the District Court's judgment under Fed. R. Civ. P. 59(e), noting that the District Court committed a legal error by not "mention[ing]"

- 7 -

or applying judicial estoppel and ignoring "the position of the leading Treatise on Bankruptcy" that post-petition debts should not be dischargeable.  The District Court denied the plaintiffs' motion, reasoning that the plaintiffs "do not challenge this Court's reading and interpretation of the Title III Court's rulings, including the Plan and the Confirmation Order, [] or 48 U.S.C. §§ 2101-2241."  It also noted that the plaintiffs' judicial estoppel and treatise arguments were not "meaningful[ly] discuss[ed]."

In its rulings, the District Court did not directly address the plaintiffs' contention that post-petition claims should not be discharged because bankruptcy law principles suggest such a discharge is improper.  Nor did the District Court address the plaintiffs' argument that their claims against the Department failed to qualify under the Plan as claims for administrative expenses.

This timely appeal followed.

**II.**

The plaintiffs' lead argument to us is that, under section 301 of PROMESA -- which, as we have noted, incorporates 11 U.S.C. § 944 of the Bankruptcy Code -- the District Court erred in determining that, because they did not file proof of their claims with the Title III court by the Plan's pre-petition bar date of June 29, 2018, their claims had been discharged by the Plan upon

its Effective Date of March 15, 2022. They contend, based on this argument, that the District Court erred in permanently staying their claims and enjoining them from continuing their actions to recover those claims.

The plaintiffs' argument depends on the following chain of reasoning. In their case, almost all the conduct for which the retaliation claims seek relief arose <u>after Puerto Rico filed its petition</u> for reorganization. That matters because section 301 of PROMESA incorporates 11 U.S.C. § 944 of the Bankruptcy Code, and a bankruptcy treatise asserts that this provision of the Bankruptcy Code must be interpreted to mean "that only <u>prepetition</u> debts are discharged." <u>See</u> <u>Collier on Bankruptcy</u> ¶ 944.03[2][b] (Richard Levin & Henry J. Sommer eds., 16th ed. 2020) (emphasis added). Moreover, their retaliation claims "do not qualify as" claims for "administrative expense[s]." Thus, it follows that if we were to agree with the District Court that their claims against the Department were discharged, then, the plaintiffs argue, they "would be barred from receiving <u>any</u> compensation, which is not an equitable result."

Notably, though, in pressing this argument, the plaintiffs do not dispute that if their claims qualify as administrative expenses, then they could have filed proof of them with the Title III court before the administrative claims bar date had passed. They also do not dispute that, under the Plan, such

- 9 -

administrative expense claims are discharged upon the Plan's confirmation if no proof of them has been timely filed with the Title III court.

Thus, because we may affirm the ruling below on any ground manifest in the record, see Peguero-Moronta v. Santiago, 464 F.3d 29, 34 (1st Cir. 2006), we begin and end our analysis of the plaintiffs' first ground for challenging the ruling below by explaining why the Department is right that the claims at issue here qualify as "administrative expense" claims and so were discharged upon the Plan's confirmation. This is so because, if the claims were discharged, then there would be no reason to vacate the District Court's stay and injunction order (save, of course, if the plaintiffs' judicial estoppel argument were to have merit).[2]

---

[2] Save for their argument addressed below about judicial estoppel, the plaintiffs make no argument to us that, insofar as their claims do qualify as administrative expenses, the injunction and stay may not be affirmed on that basis. Necessarily, therefore, the plaintiffs do not argue to us that we cannot affirm the injunction and stay on the ground on which we affirm because the administrative claims bar date is subject to a "for cause" exception, 11 U.S.C. § 503(a); 48 U.S.C. § 2161(a), which could have affected the District Court's decision of whether to issue an injunction and stay at all. We conclude that any such argument for overturning the injunction and stay is therefore waived. In finding this waiver, we note that the plaintiffs fail to make any such argument to us even though -- at the time that they appealed to this Court -- the plaintiffs were on notice that (1) their claims might be considered claims for administrative expenses subject to the Plan and PROMESA and (2) the Department was asking us to affirm the injunction and stay based on those claims being of that kind. The Department clearly raised that possibility in

- 10 -

See 11 U.S.C. § 524(a)(2) (noting that, under federal law, a bankruptcy court's "discharge . . . operates as an injunction against the commencement or continuation of an action . . . to collect" on a discharged claim); see also 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 524(a)(2) into PROMESA).

## A.

Under PROMESA, by virtue of its incorporation of §§ 503(b) and 507(a)(2) of the Bankruptcy Code, see 48 U.S.C. § 2161(a), an administrative expense must be paid by debtors to creditors and claimants "earlier than other categories of expenses in a Title III case," In re Fin. Oversight & Mgmt. Bd. for P.R., 92 F.4th 355, 359 (1st Cir. 2024). The Bankruptcy Code prioritizes a claim for payment of an administrative expense in this way to encourage third parties to do business with entities undergoing Chapter 11 reorganization. The notion is that third parties "clearly will not do so unless their claims for payment will be paid ahead of the pre-petition debts and liabilities of the debtor." In re Mammoth Mart, Inc., 536 F.2d 950, 954 (1st Cir. 1976).

---

its Notice of Injunction. Indeed, the plaintiffs even responded in their opposition to the Notice of Injunction that their claims could not be considered claims for administrative expenses, and they have maintained that position in their appeal to us despite the Department arguing otherwise in urging us to affirm the injunction and stay.

- 11 -

We understand a similar rationale to underlie the prioritization of administrative expense claims under PROMESA. There is a similar need in that context to encourage third parties to do business with Puerto Rico while it undergoes reorganization. See In re Fin. Oversight & Mgmt. Bd. for P.R., 77 F.4th at 39 ("Indeed, it is unlikely that any postpetition third party would contract with Puerto Rico's instrumentalities or risk default on their obligations.").

At the same time, the Bankruptcy Code provides that, so long as there is notice, see 11 U.S.C. § 944(c)(2), bankruptcy courts have the power to discharge "all debts as of the time when . . . the [reorganization] plan is confirmed," id. § 944(b)(1) (emphasis added); see also id. § 1141(d) (same in the Chapter 11 context). Thus, while § 503 -- which, again, PROMESA incorporates -- provides that "[a]n entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause," id. § 503(a), "administrative expense claims not timely filed by [a reorganization plan's] bar date" may be discharged, Ellis v. Westinghouse Elec. Co., 11 F.4th 221, 230 (3d Cir. 2021); see also In re Eagle-Picher Indus., Inc., 447 F.3d 461, 465 (6th Cir. 2006) ("[Section 503] does permit the parties to establish a bar date by which time all administrative expenses must be asserted against the debtor or face discharge.").

- 12 -

We see no reason to conclude that PROMESA operates any differently. Indeed, here, when interested parties were notified of the Plan's Effective Date, that notice explicitly stated that, under the Plan, "fail[ure]" to file proof of an administrative expense claim by the "Administrative Deadline" would mean an individual or entity "[would] be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim" against Puerto Rico. Thus, we conclude that, under PROMESA, an administrative expense claim (following proper notice or actual knowledge) that is not timely filed under the Plan is discharged.

What, then, is an "administrative expense" under PROMESA? "The definition of administrative expense in a [PROMESA] case comes from section 503(b) of the Bankruptcy Code, which PROMESA incorporates." In re Fin. Oversight & Mgmt. Bd. for P.R., 92 F.4th at 359 (citation modified). Section 503(b), in turn, defines administrative expenses as "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b).

Notably, however, the Bankruptcy Code's administrative expense prioritization provisions have "been interpreted as providing general protection to claimants that are injured by" the debtor's ongoing operations during Chapter 11 reorganization, "even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the estate." In re Mammoth Mart, 536 F.2d at 954. For example, the Supreme Court in

- 13 -

Reading Co. v. Brown, 391 U.S. 471 (1968), held that a tort claim -- based on a debtor's receiver, acting within the scope of its authority, negligently causing a fire that destroyed property owned by the plaintiffs in that case -- could be considered an administrative expense. Id. at 473, 485.

The Supreme Court reasoned that such claims arising from the negligence of a debtor or its agents working on behalf of the entity could be considered "costs ordinarily incident to operation of a business." Id. at 483. The Court therefore held that "tort claims arising during a[] [bankruptcy] arrangement" could be treated as "actual and necessary expenses of the arrangement." Id. at 482.

This Court later applied Reading's expansive definition of administrative expenses to include civil compensatory fines assessed against a debtor undergoing Chapter 11 reorganization who had violated a temporary injunction. See In re Charlesbank Laundry, Inc., 755 F.2d 200, 202-03 (1st Cir. 1985). We thus have not treated Reading's expansive understanding of "administrative expenses" to be limited to claims seeking payment for unlawful conduct by the debtor that was merely negligent rather than intentional. See id. at 203 ("If fairness dictates that a tort claim based on negligence should be paid ahead of pre-reorganization claims, then, a fortiori, an intentional act which violates the law and damages others should be so treated.");

- 14 -

see also In re Munce's Superior Petroleum Prods., Inc., 736 F.3d 567, 573 (1st Cir. 2013)(concluding that "fines for noncompliance post-petition with state environmental law can be granted administrative expense priority").

Other circuit courts have similarly applied Reading's broad definition of administrative expenses. They have understood that definition to include payments sought in employment relationship-based claims. And they have done so notwithstanding that the claims sought payment for allegedly unlawful conduct on the part of the debtor that was intentional rather than, as in Reading itself, merely negligent. See, e.g., Ellis, 11 F.4th at 230 (holding that age "discrimination claims are 'actual and necessary' administrative expenses"); Sanchez v. Nw. Airlines, Inc., 659 F.3d 671, 679 (8th Cir. 2011) (holding that discrimination claims based on the Americans with Disabilities Act can be considered administrative expenses).

We have not had occasion to address what constitutes an "administrative expense" under PROMESA for purposes of post-petition dischargeability. Nor have we had had occasion to address whether PROMESA adopts Reading's expansive interpretation of what constitutes an administrative expense. But we see no reason to construe PROMESA as having adopted a narrower definition of administrative expenses than does the Bankruptcy Code provision that PROMESA directly incorporates. See Holmes v. Sec. Inv. Prot.

_Corp._, 503 U.S. 258, 268 (1992) (noting that because Congress "used the same words" in a new statute that it did in an older statute, courts "can only assume [Congress] intended [those words] to have the same meaning that courts had already given them."). So, we conclude that a claim for payment that would qualify as a claim for an administrative expense under the Bankruptcy Code based on _Reading_ also qualifies as such a claim under PROMESA.

**B.**

Against this background, "[w]e see no reason why the claim[s] of plaintiffs in this case do[] not fall within both the letter and the spirit of _Reading_." _In re Charlesbank Laundry_, 755 F.2d at 202. Puerto Rico maintained its police force, including by employing the plaintiffs, while it was undergoing reorganization under PROMESA. And in the process of maintaining this police force, the plaintiffs claim that Puerto Rico, through its Police Department, unlawfully retaliated against them. The plaintiffs allege a harm stemming from their employment relationship with the Puerto Rican government, and as such, that harm is a "cost[] ordinarily incident to operation of" the Puerto Rican government. _Reading_, 391 U.S. at 483.

This conclusion accords with the approaches taken by other circuits. For example, in _Ellis_, 11 F.4th 221, the Third Circuit held that age discrimination claims could be considered administrative expenses, while noting that "[w]ithout the

assurance that any valid employment discrimination claim would be paid in full, workers may leave based on fear that their rights will not be fully protected." Id.; see also Sanchez, 659 F.3d at 679 (concluding that the plaintiff's Americans with Disabilities Act claim could constitute an administrative expense because "[i]t ar[ose] out of the regular employment relationship between the debtor and its employee, and involve[d] . . . a breach of a statutory duty not to discriminate" and that "[w]ithout th[at] relationship, the debtor could not continue to function and meet its obligations to customers").

We therefore conclude that the claims brought against the Department in this case constitute claims for "administrative expenses" under § 503(b), as incorporated into PROMESA. It follows that these "administrative expense" claims were discharged, given that the plaintiffs do not dispute that they did not timely file them before the administrative claims bar date. Accordingly, we reject the plaintiffs' first ground for challenging the ruling below that, as, per the Plan's provisions, the plaintiffs are "forever barred, estopped, and enjoined from asserting such Administrative Expense Claim[s]" against Puerto Rico.[3]

_____

[3] During oral argument, the plaintiffs argued that they were not given sufficient notice by the Department that their retaliation claims could be subject to the Plan's deadlines for submitting proof of administrative expense claims. But the

- 17 -

## c.

The plaintiffs' alternative ground for challenging the ruling below is that the District Court erred by not applying judicial estoppel to bar the Department from seeking the permanent stay and permanent injunction on the ground that the claims had been discharged under the Plan. The plaintiffs reasoned that the Department did not file the Notice of Injunction until years after the plaintiffs had filed their complaint in the District Court and that, in consequence, by continuing to litigate the merits of the claims, the Department was "telling the District Court that [the Plan] did not apply to the case." That being so, the plaintiffs contend that the Department cannot now argue that the Plan discharged the claims because that position is "clearly inconsistent" with the Department's eventual request in its Notice of Injunction, given that the request depends on the claims against the Department having been discharged.

---

plaintiffs failed to make this notice argument to this Court in their briefs, so they are waived. See Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015). The plaintiffs attempted to argue otherwise by pointing to certain language in their opening brief. But the sentence containing that language appears in their brief's section addressing judicial estoppel, and the brief cites no caselaw and makes no legal arguments about notice. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

The plaintiffs do not identify, however, any affirmative assertion by the Department that the Plan did not apply to the plaintiffs' claims. Indeed, as the Department points out, it consistently stated in its filings -- its motion to dismiss, its answer to the plaintiffs' complaint, and its summary judgment motion -- that it made them "without waiving any right, objection or defense arising from the Title III of [PROMESA], the Commonwealth's Petition under said Title or under this case." The plaintiffs do not, however, acknowledge those representations by the Department in nonetheless contending that the Department took a directly inconsistent position in asserting the argument that it appears had been consistently reserved. So, in that sense, the plaintiffs fail to explain how we have here the kind of "mutually exclusive," "directly inconsistent" positions that are required for a litigant to be judicially estopped from taking a certain position based on it having earlier taken a different one. Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004); see also id. at 34 (concluding that it is "totally inconsistent" to disclaim at the motion to dismiss phase reliance on a "breach of contract theory based on an alleged parol agreement" and then, at summary judgment, assert that the "breach of contract claim" relates to "a permanent oral agreement" outside of the written agreement at issue in the case (citation modified)).

Insofar as the plaintiffs mean to contend that (the consistent reservation notwithstanding) the Department nonetheless told the District Court that the Plan did not apply to the Plaintiffs' claims against it by <u>not earlier</u> affirmatively asserting that the Plan stood in the way of the claims, they fail to cite any authority for the proposition that a party disclaims any argument that it does not make when it first could. Nor do they cite any authority that such silence amounts to a waiver of the contention. Nor, finally, do the Plaintiffs do so in a case in which -- as is the case here -- the party against whom judicial estoppel is asserted repeatedly reserved the defense that they are alleged to have affirmatively disclaimed. We thus fail to see on what basis we could conclude that the plaintiffs have sufficiently shown that the District Court abused its discretion -- on the arguments before it -- in declining to apply judicial estoppel to keep the Department from making the argument in question at a later time. <u>See</u> <u>Alt. Sys. Concepts</u>, 374 F.3d at 30 (noting that the applicable standard of review for judicial estoppel determinations is "abuse of discretion"). Accordingly, we must reject this ground for disturbing the judgment at issue as well.[4]

---

[4] We note that we have no reason to address here -- and so do not address -- the question of whether the plaintiffs may successfully file a claim for administrative expenses in the Title III court on "for cause" grounds pursuant to 11 U.S.C. § 503(a).

- 20 -

## III.

For the foregoing reasons, the District Court's judgment
is **affirmed**.


—**Concurring Dubitante Opinion Follows**—

---

We also need not decide whether, because we conclude that the plaintiffs' claims are claims for administrative expenses under PROMESA and so have been discharged, we lack jurisdiction to address their assertion of judicial estoppel. Because we conclude that the judicial estoppel argument is without merit, we may address it pursuant to the doctrine of hypothetical jurisdiction. See Johansen v. Liberty Mut. Grp., 118 F.4th 142, 148 (1st Cir. 2024) ("Where a case poses a question of statutory, not Article III, jurisdiction and where a decision on the merits will favor the party challenging the court's jurisdiction, we may assume that we have jurisdiction to reach the merits of an appeal." (citation modified)).

**THOMPSON**, <u>Circuit Judge</u>, concurring *dubitante*. The majority's likely right that the Title III bankruptcy court is now the only forum for Jimmy Villalobos-Santana and Jimmy Colón-Rodríguez's civil rights case, which we today hold is an "administrative expense" for PROMESA purposes.[5] But admittedly, "I am worried about where the law is in this area and where it might go," so I write <u>dubitante</u> to express my concerns. <u>Rosenthal v. Bloomingdales.com, LLC</u>, 101 F.4th 90, 98 (1st Cir. 2024) (Thompson, J., concurring <u>dubitante</u>).

To be more specific: I respectfully disagree with the majority's judicial estoppel analysis, so I cannot join Part II-C. Unlike the majority, I see no reason to reach the estoppel analysis on the merits because (as I'll explain more fully below) PROMESA seems to require cases covered by the Plan to be permanently enjoined and discharged; a party cannot prevent that result using judicial estoppel. <u>See</u> 11 U.S.C. § 524(a)(2); 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 524(a)(2) into PROMESA). Yet that leads me to functionally the same conclusion as the majority -- that estoppel can't help Villalobos -- thus the concurrence.

But I also think it's necessary to spell out in layman's terms (1) why, if I were to look past that threshold PROMESA

---

[5] Going forward, I'll just focus on Villalobos (whose name I shorten based on Spanish naming customs), but my analysis applies equally to Colón.

- 22 -

question (as the majority does), I would find PRPD's litigation conduct estoppel-worthy and (2) what this bankruptcy case means for civil rights litigants like Villalobos.  On both fronts, I have some concerns.

**I**

In the spring of 2024, Villalobos was on the precipice of exercising his right to a jury trial after three long years of litigation.  He first filed a complaint against PRPD in 2021, alleging that the department discriminated against him based on his age and then retaliated against him when he tried to do something about it.  PRPD filed an answer soon afterwards.  Naturally, both parties then conducted discovery in 2022 and 2023.  Villalobos next survived a contested motion for summary judgment earlier in 2024.  And after all that, the district court put a pretrial conference on the calendar for May 29, 2024, and Villalobos's long-due day in court thus seemed imminent.

But on May 6, 2024, PRPD moved to stay and enjoin the litigation permanently.  Why?  Long story short: years ago, the Commonwealth of Puerto Rico was in a financial crisis.  See In re Fin. Oversight & Mgmt. Bd. for P.R., 92 F.4th 355, 358-59 (1st Cir. 2024).  In 2016, Congress passed a statute (PROMESA) that created both a financial oversight board endowed with serious powers to get Puerto Rico back on a good fiscal track and a special court (what we call "the Title III court") to oversee Puerto Rico's

- 23 -

debt reorganization. Id. So the board spent years in court putting together a bankruptcy plan. And in January 2022, the Title III court approved a plan that would "discharge and release" (essentially, wipe out) almost all outstanding claims against the Commonwealth (and its subsidiaries, like PRPD) two months later (on March 15, 2022) and also enjoin litigants from pursuing those claims anymore as of that March 15 date.[6]

So, in its May 2024 motion, PRPD -- for the first time -- said that Villalobos's civil rights claim had been discharged by the Plan more than two years earlier. PRPD didn't advise Villalobos or the district court about the possibility of discharge back in 2021, when Villalobos filed the operative complaint and the Plan was pending. PRPD said nothing to the district court or Villalobos back in January 2022, when the Title III court approved the Plan. PRPD notified neither Villalobos nor the district court in March 2022, as the deadline to file a claim in the bankruptcy court approached -- despite the fact that failure to file a claim would mean that Villalobos was "forever barred, estopped, and enjoined" from further pursuing his case.[7]

---

[6] I say "almost all," because as the majority rightly explains, some "administrative expenses" could ultimately be filed without leave of court until January 2023.

[7] Again, some claims could ultimately be filed until January 2023. But PRPD (in its May 2024 filing) didn't seem to think

(More on that ominous-sounding language later.)  And PRPD didn't raise the Plan's discharge as a bar to Villalobos's claim back when it filed its summary judgment papers in 2023.  Instead, it only took the discharge sword out from its scabbard <u>after</u> the district court denied PRPD summary judgment, scheduled a pretrial conference, and ordered a joint pretrial memorandum to be submitted -- i.e., once trial was imminent.  But by then -- again, May 2024 -- the deadline to file claims in bankruptcy court had long passed.[8]

Villalobos cried foul on PRPD's strategy.  He invoked a doctrine called "judicial estoppel," which allows the judge to halt dubious litigation tactics -- particularly parties taking inconsistent positions in the course of a case -- to protect the integrity of the judicial process.  Villalobos argued that PRPD talked out of both sides of its mouth by seeking to end the case on the merits several times, never mentioning PROMESA discharge, but then, after failing to secure pretrial dismissal, suddenly whipping out the PROMESA discharge argument despite the Plan having gone into effect years ago.

---

Villalobos's claim was one of those; it pinned the deadline at March 15, 2022, making its delay in raising the issue even more troubling.

[8] It had long passed no matter if you think that the deadline was March 2022 (as PRPD originally contended) or January 2023.

The district court didn't buy Villalobos's estoppel argument, so it granted PRPD's motion, teeing up our appellate task.

**II**

I'll start with a point that the majority sets aside. In its appellate brief, PRPD argues that "the defense of discharge in bankruptcy has been characterized as an absolute, nonwaivable defense." It's a technical argument but a noteworthy one involving "the balancing act of considering the importance of providing judicial redress for civil rights violations without thwarting any of PROMESA's critical debt-restructuring goals." Víctor J. Salgado & Assocs. v. Cestero-Lopategui, 34 F.4th 49, 56 (1st Cir. 2022) (Thompson, J., concurring). And it's the sole ground that I would use to resolve the estoppel question, unlike the majority.

Here's how I see it. A bankruptcy "discharge" is an order that releases a debtor (here, Puerto Rico and through it, PRPD) from personal liability to creditors and claimants like Villalobos. After the discharge, there's simply no obligation to pay those creditors and claimants anymore and the case against the debtor must stop. See, e.g., Ellis v. Westinghouse Elec. Co., 11 F.4th 221, 226 (3rd Cir. 2021) (explaining how under a discharge, "the creditor cannot pursue the claim further and the debtor is released from the liability"). We today conclude that the Plan discharged Villalobos's claim because it was an "administrative

- 26 -

expense." And PROMESA establishes that a discharge "operates as an injunction against the commencement or continuation of an action . . . whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2) (emphasis mine); see 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 524(a)(2) into PROMESA). So the question becomes (as PRPD suggests) whether judicial estoppel can halt a discharge defense.

The answer, I believe, is no. "Estoppel theories may not be used to circumvent the effect of the discharge and the discharge injunction." In re Gurrola, 328 B.R. 158, 172 (B.A.P. 9th Cir. 2005) (cleaned up). The reason why? The Bankruptcy Code (and PROMESA, through its incorporation of 11 U.S.C. § 524(a)(2)) seems to require cases covered by the Plan to be discharged no matter what -- even if the party seeking the discharge raised that discharge defense later than is preferable and would have otherwise "waived" it by our typical litigation standards. 11 U.S.C. § 524(a)(2); 48 U.S.C. § 2161(a); see In re Meadows, 428 B.R. 894, 904-07 (Bankr. N.D. Ga. 2010) (providing a helpful history of § 524(a)). The Ninth Circuit Bankruptcy Appellate Panel has explained how the statute's use of the term "waived" also implicates estoppel:

> Estoppel theories are equitable theories typically based on conduct. The usual argument is that the person to be estopped has done, or omitted to do, something that makes it inappropriate for them to rely on a right

- 27 -

> that otherwise is available. This, in a
> functional sense, is merely one variety of
> waiver.

In re Gurrola, 328 B.R. at 172. As far as I can tell, other courts to address the question of estoppel's applicability to a discharge seem to reach the same answer. See In re Kimmel, 378 B.R. 630, 638 (B.A.P. 9th Cir. 2007), aff'd, 302 F. App'x 518 (9th Cir. 2008) (same); In re Couture, No. 22-35479, 2023 WL 6058491, at *2 (9th Cir. Sep. 18, 2023) (same); see also In re Hamilton, 540 F.3d 367, 373 (6th Cir. 2008) (holding, similarly, that "a debtor need not raise his discharge in bankruptcy as an affirmative defense, because thanks to § 524(a) such an affirmative defense is unnecessary and has been since 1970" (cleaned up)).

Villalobos's estoppel theory fits neatly within that paradigm. Essentially, he says PRPD must "be estopped" from raising its discharge defense because it "has done . . . something that makes it inappropriate for [PRPD] to rely on a right that otherwise is available." In re Gurrola, 328 B.R. at 172. That "something" was litigating for years without telling Villalobos or the district court about the discharge's effect on his case, making it "inappropriate" to raise discharge so late in the game -- a classic waiver-style argument, and thus one probably foreclosed by § 524(a)(2). Id.

So I would end the analysis there, holding that Villalobos couldn't invoke estoppel to prevent the PROMESA discharge.

### III

The majority does not decide that threshold question. Instead, based on the hypothetical jurisdiction doctrine, it addresses the merits of Villalobos's estoppel argument because it concludes that the argument "is without merit." I respectfully disagree: if I were to set aside my threshold concerns, I think Villalobos is right on the merits of the estoppel question.

Judicial estoppel's "primary utility is to safeguard the integrity of the courts by preventing parties from improperly manipulating the machinery of the judicial system." Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004). As I explained above, PRPD sat on its hands about the discharge's consequence until it was far too late for Villalobos to get into bankruptcy court by ordinary means. That is precisely the sort of improper manipulation of the judicial system that estoppel should protect against (again, assuming it's applicable). See id. In that respect, I agree with Villalobos: that PRPD "magically remembered" (his words) how the Plan applied to Villalobos's case only after the discharge date had long passed -- and, again, once trial was imminent -- shows that PRPD was likely "playing false [presumably meaning fast] and loose with the Court" (also his

words).  See New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (explaining that the doctrine's "purpose is to protect the integrity of the judicial process" and collecting cases for that proposition (cleaned up)).

To reach the opposite conclusion relative to the estoppel issue, the majority relies on two main facts: (1) that PRPD never made a specific affirmative statement that the Plan didn't apply and (2) that PRPD generally reserved PROMESA defenses in its various filings over the years.  I don't find either point dispositive.

As to the first, I agree that the prototypical judicial estoppel case most often seems to involve directly contradictory statements.  But remember, "there is no mechanical test for determining [judicial estoppel's] applicability" and "each case tends to turn on its own facts."  Alt. Sys. Concepts, 374 F.3d at 33 (cleaned up); see also New Hampshire, 532 U.S. at 750 (explaining that "courts have observed that the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle" (cleaned up)).  And here, PRPD, aware of the PROMESA restructuring and its likely impact on any and all Commonwealth debt, remained mute for years.  It then deployed PROMESA only long past the discharge deadline -- once it seemed that Villalobos couldn't file his claim in the bankruptcy court by the administrative bar date

and would thus likely be deprived of the right to pursue his claim in <u>any</u> forum.[9]  So in these unique circumstances, the lack of a directly contrary statement shouldn't be decisive for the estoppel analysis.

As to the second, the rote statement that PRPD included at the beginning of some filings -- that it just acted "without waiving any right, objection or defense arising from the Title III of Puerto Rico Oversight, Management and Economic Stability Act ('PROMESA'), 48 U.S.C. §§ 2101 et seq." -- doesn't strike me as sufficient.  That unspecific preservation of rights hardly let on that discharge was imminent, that the case needn't go on, and that neither judicial nor party resources needed to be expended further.  PRPD even included that generalization in its summary judgment motion -- filed <u>after</u> the PROMESA deadline had passed, when discharge had effectively rendered the district court's proceedings a nullity.  Yet there's nary a mention of the discharge (or PROMESA, after the first paragraph) in that motion.  So PRPD's repeated inclusion of that vague statement in past filings turns out only to be further evidence of the impropriety of its "Heads I win, tails you lose" approach.

---

[9] Except, of course, if the Title III court decided in its discretion to accept his filing late, which I discuss more below.

- 31 -

And to re-emphasize, the majority also neglects how PRPD -- either intentionally or through wanton negligence -- wasted scarce judicial and party resources <u>for years</u> by sleeping on this defense until trial was imminent, and until its litigating opponent was presumably long locked out of bankruptcy court. See <u>New Hampshire</u>, 532 U.S. at 750. More than <u>eighty-five percent</u> of the docket entries in this case occurred after the PROMESA deadline that PRPD thought applied: March 15, 2022.[10] That included discovery, a settlement conference, and PRPD's summary judgment motion, all of which could have been avoided if PRPD timely notified the court and Villalobos of PROMESA's consequences for this case. And even under the January 2023 filing deadline, more than <u>seventy percent</u> of the docket action came afterward. At either moment PRPD could have invoked the discharge defense, yet it marched onwards in the district court all the same -- at least until it conveniently decided it was done with doing so and Villalobos seemed to be sufficiently shut out of the Title III court. Gamesmanship might be viewed as inevitable and, unfortunately, an acknowledged part of litigation, but this

---

[10] I say "that PRPD thought applied" because, in holding that Villalobos's case is an "administrative claim," it seems that the actual deadline could have been as late as January 2023, as I've indicated in past footnotes.

(in my view) is more than that -- it is something that amounts to a direct "perversion of the judicial process." Id. (cleaned up).

Civil rights claims have proven to be hard to bring as it is. See, e.g., Clemente Props., Inc. v. Pierluisi-Urrutia, 165 F.4th 1, 7 (1st Cir. 2026) (noting the "obstacle course of doctrinal immunities designed to protect governments and officials from lawsuits"). The field "is riddled with doctrines, rules, and mechanisms that make claims . . . nearly impossible to bring successfully." Tempest v. Remblad, No. 1:20-cv-00523-MSM-LDA, 2025 WL 2322442, at *10 (D.R.I. Aug. 12, 2025), appeal docketed, No. 25-1823 (1st Cir. Sep. 3, 2025). So when governments and officials get cagey (to describe it politely) with litigation tactics in these already-tough-to-bring cases, I respectfully see no reason to give such a litigant the benefit of the jurisprudential doubt in the way that the majority today has.

**IV**

Estoppel aside, I turn now to the main issue we address above -- whether Villalobos's claim is an "administrative expense." I appreciate the majority's careful approach and don't see an error. But given the "byzantine" nature of bankruptcy law, the majority's discussion is naturally filled with terms of art that may not be clear to most people, including experienced civil

- 33 -

rights litigators.[11]  Guallini-Indij v. Banco Popular De P.R., No. 23-1705, 2026 WL 607314, at *2 (1st Cir. Mar. 4, 2026).

Two things are important to clarify.  First, today's opinion classifies Villalobos's civil rights claim as an "administrative expense."  Second, at times, the majority emphasizes how Villalobos is "forever barred, estopped, and enjoined from asserting such Administrative Expense Claim." Neither is (in my view) quite what it sounds like at first.  That's to say, this result might be beneficial for Villalobos (and similarly situated plaintiffs) in some ways.

As to the administrative expense point: I realize that at face, it seems odd to reduce an alleged violation of civil rights to something as mundane-sounding as an "administrative expense."  But in bankruptcy terms, that categorization has advantages.  As the majority explains (quoting one of our past decisions), "[t]his category of expenses is paid by debtors to creditors earlier than other categories of expenses in a Title III case."  In re Fin. Oversight & Mgmt. Bd. for P.R., 92 F.4th at 359.  There's at least one other possible benefit, which leads right into my next point of clarification.

---

[11] Among those possibly unfamiliar terms: "administrative expenses," "discharged claims," "pre-petition debts," "post-petition debts," "Chapter 11 reorganization," and "prioritization."

As to the "forever barred" language that the majority uses, I don't think it's as fatal as it sounds.[12]  Going just an inch further than the majority to hopefully provide some clarity,[13] I see no reason why Villalobos cannot still pursue his administrative expense claim in the bankruptcy court.[14]  Ellis, 11

---

[12] To be clear: the majority correctly quotes the PROMESA documents.  My point is one of emphasis, not substance.

[13] The majority says it has "no reason to address" this issue. But I see a big reason: Villalobos (incorrectly) says in his appellate brief that if PRPD isn't estopped, he can't file a claim in the bankruptcy court and so he will necessarily be paid nothing. Explaining why that's not right because of the majority's reasoning is, in my view, an important part of our job. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.  Those who apply the rule to particular cases, must of necessity expound and interpret that rule.").

[14] The majority's Footnote 2, which discusses a potential waiver issue connecting the district court's decision to 11 U.S.C. § 503(a), is not to the contrary.  While the footnote rightly observes that Villalobos doesn't cite § 503(a) as a reason to reverse the district court's stay and injunction, I think there's a few important reasons why.

First, as far as I can tell, the only § 503(a) connection to Villalobos's case is that he can (after today's ruling) pursue his claim as an administrative expense in the Title III court if (1) he files there and (2) the Title III court permits the late filing under the "for cause" exception laid out in § 503(a).  But it's the Title III court's job, not the district court's, to make that "for cause" determination, and it's an entirely separate analysis from what we're thinking about today; in other words, I don't see how § 503(a), a statute about the bankruptcy court's discretion that hasn't yet been invoked, could offer an independent basis to reverse the district court's decision today.

Consequently, Villalobos surely needn't argue about § 503(a) in the district court (and before us) to preserve a "for cause"

- 35 -

F.4th at 239 & n.12.  The Bankruptcy Code establishes that a party "may timely file a request for payment of an administrative expense, or," as relevant for Villalobos, "may tardily file such request if permitted by the court for cause."  11 U.S.C. § 503(a) (emphasis mine).  PROMESA incorporated all of § 503.[15]  See 48 U.S.C. § 2161(a) (explaining that § 503 is a section "applicable to cases under this subchapter"); In re Fin. Oversight & Mgmt. Bd. for P.R., 7 F.4th 31, 37 (1st Cir. 2021) ("Congress incorporated numerous provisions of the Bankruptcy Code into Title III of PROMESA, including § 503 in its entirety.").  That naturally includes this subsection about late filings, too.

So Villalobos (if he has not already done so following oral argument) might want to go to the bankruptcy court, file a claim, and petition the court to accept his late filing "for cause."  11 U.S.C. § 503(a).  True, it's of course within the Title III court's sound discretion whether to accept it, but the court

---

argument in a separate bankruptcy proceeding that (as I understand) hasn't started yet.

And if there's any doubt about Footnote 2's implications, Footnote 4 later makes clear that the majority's not touching anything related to § 503(a) in the main opinion.

[15] In contrast, PROMESA incorporated only specific subsections of other parts of the Bankruptcy Code.  See 48 U.S.C. § 2161(a) (incorporating, for instance, 11 U.S.C. §§ 347(b), 350(b), and 364(c)-(f)).  We must assume those differences matter, given our background presumption "that the legislature says what it means and means what it says."  Henson v. Santander Consumer USA Inc., 582 U.S. 79, 89 (2017) (cleaned up).

might well do so given (1) PRPD's litigation strategy here, described above, and (2) the fact that it wasn't clear before today that Villalobos had an "administrative expense" claim. See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 387 (1993) ("There is, of course, a range of possible explanations for a party's failure to comply with a court-ordered filing deadline.").

Yet I will say that today's result certainly isn't all good for Villalobos. After litigating for years, he's possibly lost out on his day in court before a jury of his peers, despite it being almost within his grasp. And due to PRPD's litigation conduct, a claim that years of litigating had proven trial-worthy will now -- assuming Villalobos even files his claim in the bankruptcy court -- hang in the balance based on the Title III court's discretionary "for cause" determination.

Of special note, the loss of Villalobos's Seventh Amendment civil jury trial right isn't to be taken lightly. See Perttu v. Richards, 605 U.S. 460, 467 (2025) ("The right to trial by jury is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right has always been and should be scrutinized with the utmost care." (cleaned up)). If nothing else, Puerto Rico's bankruptcy has

possibly caused Villalobos to lose out on that sacrosanct right.[16] "The result may be severe, but that is [the] price for a debtor's fresh start." Ellis, 11 F.4th at 239. For Villalobos, it is a high price indeed.

* * * *

For those reasons, I concur dubitante.

_____

[16] I say "possibly" because, in at least one other non-PROMESA case, it seems a bankruptcy claimant was still able to get before a jury. See In re Highcrest Mgmt. Co., 30 B.R. 776, 778-79 (Bankr. S.D.N.Y. 1983) (lifting the automatic stay to permit a jury trial to proceed in the district court); 28 U.S.C. § 157(e); see also Ellis, 11 F.4th at 238 (noting but declining to wade "into the morass" of the Seventh Amendment questions posed by a similar administrative expense holding). Whether Villalobos can pursue this path is another tricky question of constitutional and statutory law for the capable Title III court.